**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TANITRIA C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 CV 1884** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **ANDREW SAUL, Commissioner** | ) | |
| **of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Tanitria C. ("Claimant") brings a motion for summary judgment to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The Commissioner brings a cross-motion seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, Claimant's motion for summary judgment (Dckt. #10) is denied and the Commissioner's motion for summary judgment (Dckt. #17) is granted. The decision of the Administrative Law Judge ("ALJ") is affirmed.

**I.     BACKGROUND**

**A.     Procedural History**

On November 30, 2015, Claimant (then 30-years old) filed for SSI, alleging disability beginning January 15, 2013, due to disc disease and heel spurs. (R. 62.) Claimant's applications

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name. Moreover, Andrew Saul is now the Commissioner of Social Security and is substituted in this matter pursuant to Fed.R.Civ.P. 25(d).

were denied initially and upon reconsideration. (R. 62-84.) Claimant filed a timely request for a hearing, which was held on October 24, 2017 before an ALJ. (R. 25-61.) After being fully informed of her right to representation, Claimant proceeded without counsel and offered testimony at the hearing, as did her grandmother. A vocational expert also offered testimony.

On April 5, 2018, the ALJ issued a written decision denying Claimant's application for benefits. (R. 11-20.) Claimant filed a timely request for review with the Appeals Council. On January 16, 2019, the Appeals Council denied Claimant's request for review, leaving the decision of the ALJ as the final decision of the Commissioner. (R. 1-3.) This action followed.

**B.    The Social Security Administration Standard**

In order to qualify for disability benefits, a claimant must demonstrate that she is disabled. An individual does so by showing that she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404,

Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id.* If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if she can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

### C.    Claimant's Arguments for Remand

Claimant urges this Court to reverse and remand the ALJ's decision to deny her an award of benefits based on her arguments that the ALJ: (1) did not appropriately assess her obesity and her limitations in standing and sitting down when evaluating her RFC; (2) did not adequately evaluate her subjective allegations; and (3) improperly failed to credit the testimony of her grandmother, Joyce Blue. In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence because the ALJ properly considered her obesity and all relevant evidence, including the medical record, medical source statements, and Claimant's subjective symptoms, when determining that Claimant maintained the RFC to perform sedentary work.

### D. The Evidence Presented to the ALJ

Claimant seeks disability benefits for limitations stemming from disc disease and heel spurs. The administrative record contains the following relevant evidence that bears on Claimant's claim:

### 1. Evidence from Claimant's Treating Physicians

Claimant is about 5 feet, 8 inches tall. (R. 259.) Over the course of Claimant's relevant treatment records, her weight fluctuated between 300 to 380 pounds. (R. 232, 316). An MRI of the lumbar spine from April 2014 due to "low-back pain" showed a disc protrusion at L4-5 with mild spinal stenosis and a small disc protrusion at L5-S1 with no significant spinal stenosis. (R. 479-80.) Bilateral ankle x-rays from May 2015 for "heel pain" were normal. (R. 253.) There are no treatment records accompanying the 2014 MRI or 2015 heel x-rays.

During a July 2015 ER visit for unrelated symptoms, Claimant's physical examination was normal, with no joint pain, edema or tenderness noted. (R. 232.) An abdominal CT was normal apart from a gallstone. (R. 238.) Claimant returned to the ER in October 2015 complaining of chronic worsening back pain. (R. 244.) She explained that she had an MRI the year before that showed "a disc problem." (*Id*.) Claimant reported she was able to perform her activities of daily living. (R. 245.)

Upon physical exam in the ER, Claimant exhibited normal range of motion of the cervical and thoracic spine, with no tenderness or pain. (R. 246.) She had normal range of motion in the lumbar spine, but exhibited pain upon exam. (*Id*.) A neurological exam was normal. (R. 247.) The examining physician noted a "low index of suspicion for cord compression or epidural hematoma/abscess" and found no reason for further imaging. (*Id*.)

4

Claimant was discharged with some pain medication and was told to follow up with a primary care physician. (*Id*.)

Claimant established care with primary care physician Dr. Tuason in January 2016. She complained of worsening back pain over several years, which she was told was "disc problems." (R. 462.) She told Dr. Tuason that she "cannot do anything but lie down in bed which makes her gain weight" and "cannot work because she cannot stand up or sit or walk" for more than a few minutes. (*Id*.) Claimant also complained of right shoulder pain following a fall a few weeks prior and persistent pain on her left heel. (*Id*.) She had been taking ibuprofen for pain. (*Id*.) A physical exam showed no gross spinal deformities, no tenderness, and full range of motion of the spine. (R. 464.) Claimant did exhibit tenderness of the right shoulder with limited range of motion, as well as tenderness of the left ankle and heel. (*Id*.) Dr. Tuason assessed chronic back pain, lumbosacral degenerative disc disease, right shoulder pain due to a fall, and super obesity. (R. 464-65.) She ordered x-ray imaging, recommended weight loss through diet and exercise, warm compresses and ibuprofen for pain, and physical therapy. (*Id*.) Claimant quickly underwent x-ray imaging of her left shoulder and left foot. (R. 253-55). All of the x-rays yielded normal results, with no evidence of fracture, dislocation, or lesions. (*Id*.)

Claimant returned to see Dr. Tuason in February 2016, still complaining of back and shoulder pain and explaining that she is "unable to do anything because everything hurts, particularly her back." (R. 325.) Again, the physical exam showed no gross spinal deformities, no tenderness, and full range of motion of the spine. (R. 326.) Claimant continued to exhibit tenderness of the right shoulder with limited range of motion and tenderness of the left ankle and heel. (*Id*.) Dr. Tuason added vitamin D deficiency and dyslipidemia to her assessment based on recent blood work. (R. 327.) She again recommended weight loss and physical therapy. (*Id*.)

Claimant followed-up with Dr. Tuason again in April 2016. (R. 314.) She reported difficulty standing up for longer than a few minutes due to back pain. (*Id*.) The results of the physical exam were the same as the prior visit. (R. 316.) Dr. Tuason continued to recommend weight loss, physical therapy, and warm compresses. (*Id.*) She prescribed ibuprofen and Flexeril as needed for pain. (*Id*.) Claimant returned to see Dr. Tuason in July 2016, at which point she had lost ten pounds though she had not been following any dietary restrictions or exercising. (R. 438.)

Claimant visited Dr. Tuason in October 2016 still complaining of lower back pain, with numbness of the left lower back down to the left heel. (R. 525.) She told Dr. Tuason that she lied down most of the time because it hurt to sit, stand, or walk and that she was unable to do light house chores without stopping to rest several times. (*Id*.) A physical exam was primarily normal. (R. 526-27.) Dr. Tuason continued to prescribe Flexeril, advise weight loss, and referred Claimant to physical therapy. (*Id*.)

Claimant began physical therapy in October 2016 at Dr. Tuason's recommendation. At her initial evaluation, she told the therapist that her back pain started five years prior after she got an epidural during birth. (R. 491-92.) Her pain was aggravated with prolonged standing, sitting, walking, and bending. (R. 492.) Only pain medication, heating pads, and laying down provided relief. (*Id*.) Claimant's goal for therapy was "to relieve the pain and get back to work and play with her kids." (*Id*.) The therapist observed impaired joint mobility, motor function, and range of motion and noted functional limitations, including in activities of daily living, bending, climbing, lifting and prolonged sitting, standing and walking. (R. 493.) The therapist recommended twelve visits and issued a home exercise program. (*Id*.) At the next physical

therapy session in November 2016, Claimant's pain improved over the course of the session and she continued to work toward her goals. (R. 495-96.)

Claimant's complaints of low back pain continued at a visit with Dr. Tuason in April 2017. (R. 528.) She also complained of knee pain. (*Id.*) The physical exam again yielded minimal results and Dr. Tuason ordered further imaging. (R. 530.) X-rays of the right knee showed "minimal degenerative changes" with "well-maintained" joint spaces. (R. 489.) X-rays of the lumbar spine also showed minimal degenerative changes. (R. 490.)

By May 2017, Claimant had quit drinking pop and eating junk food and had walked a couple of times around a track for thirty minutes at a time. (R. 532.) Her lower back pain persisted, and she reported taking pain pills as needed. (*Id.*) She denied leg swelling and numbness. (*Id.*) Dr. Tuason continued to encourage a healthy lifestyle. (R. 534.)

When Claimant returned in July 2017, she had lost eleven pounds. (R. 535.) She told Dr. Tuason that she had applied for disability and that all of her attempts at work failed due to back pain. (R. 535.) She said she left work at a Starbucks store after only an hour because she could not tolerate standing. (*Id.*) Her complaints continued in October 2017, at which time she also reported that she was unable to tolerate physical therapy and that pain pills provided little relief. (R. 538.)

## 2. Evidence from Agency Consultants

On February 16, 2016, Dr. Dante Pimentel conducted a consultative examination for purposes of Claimant's SSI application. Claimant complained of daily back pain (rated a 7/10) and told Dr. Pimentel she had difficulty bending, lifting, and carrying heavy objects. (R. 258.) At that time, she was still independent with cooking, cleaning and grooming, but explained that

she could only stand for about 10 minutes before needing to sit down due to back pain. (*Id.*) She reported taking Motrin, Flexeril, Ultram, and Naproxen. (R. 258-59.)

Upon physical examination, Claimant weighed 370 pounds, which resulted in a BMI of 54.6.[2] (R. 259-60.) She exhibited some limited range of motion of the left shoulder, lumbar spine, and left knee, though Dr. Pimentel did note "doubts about claimant's full effort in examining her range of motion." (R. 262-64.) Claimant also had moderate difficulty squatting and rising and hopping on one leg, and mild difficulty getting on and off the exam table and tandem and heel/toe walking. (R. 263.) She could walk greater than 50 feet unassisted with normal reciprocal gait and without assistive devices. (R. 260.) A neurological exam was normal with normal motor strength and no signs of cervical or lumbar root compression. (*Id.*) Claimant's fine and gross manipulative movements of the hands and fingers were normal. (R. 264.)

Based on his exam and review of some of Claimant's records, Dr. Pimentel assessed lumbar disc disease, left heel spur, and obesity. (R. 260.) In his opinion, Claimant could sit and stand, walk greater than 50 feet unassisted, and was only mildly limited in her ability to lift, carry, and handle objects. (R. 260.) Dr. Pimentel further opined that "[C]laimant's ability to carry out work-related activities is mildly impaired due to back pain." (R. 260.)

Upon Claimant's initial application, State agency physician Dr. Gonzalez reviewed the record, including Dr. Pimentel's examination notes, and opined that Claimant could perform work at the medium exertional level with some further limitations. (R. 66-68.) Specifically, Dr. Gonzales opined that Claimant could occasionally lift 50 pounds, frequently 25 pounds; could

---

[2] Social Security Ruling ("SSR") 02-1p, (since replaced, but still applicable here, *see infra* at n.6), describes a BMI above 40 as extreme obesity. SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002).

stand, walk and/or sit for six hours in an eight-hour day; could occasionally climb ladders, ropes or scaffolds and crawl; and frequently stoop, kneel, and crouch. (R. 66-67.)

At the reconsideration level, Dr. Chang determined that Claimant could perform work at the light exertional level; could occasionally climb ramps, stairs, ladders, ropes or scaffolds, kneel, crouch, and crawl; and frequently balance and stoop. (R. 79.) Dr. Chang further found that Claimant could stand and sit (with normal breaks) for "[a]bout 6 hours in an 8-hour workday." (R. 78.)

###### C. Evidence from Claimant's Testimony

Claimant appeared at the October 24, 2017 hearing before the ALJ without counsel. The ALJ first fully advised Claimant of her right to representation, which she then proceeded to waive.[3] (R. 28-29, 131.) Claimant then offered the following testimony.

At the time of the hearing, Claimant was 32 years old and living with her mother and two children, ages six and ten. (R. 32-33.) She has an eleventh-grade education. (*Id.*) Claimant explained that she suffers from back, knee, and heel pain, but that it is mostly her back pain causing problems. (R. 40.) She described her back pain as a burning sensation. (R. 41.) Claimant testified she can sit for an hour before needing to lay down or use a heating pad. (R. 41.) She estimated she can stand for about five minutes before the pain kicks in. (R. 44.) She does not do much lifting. (R. 43.)

For pain relief, Claimant uses the heating pad and takes ibuprofen, Tramadol and Naproxen, which sometimes make her drowsy. (R. 37, 43.) She attempted physical therapy for a few sessions, which made her feel "a little better," but she stopped going due to transportation issues. (R. 39, 42-43.) Claimant testified that her doctor recently told her that she may need

---

[3] Claimant has not taken issue with the ALJ's advisement of her rights to counsel or her waiver thereof at the hearing stage.

surgery.  (R. 48.)  She is hoping to try physical therapy again to avoid the need for surgery.  (*Id*.)  Claimant stated that she was going to schedule more physical therapy sessions on days when her grandfather was free to take her because he was not working.  (R.48.)

On a typical day, Claimant wakes around six and gets her children ready for school.  (R. 45.)  After she drops off the kids, she comes home and tries do a few chores before her back pain sets in.  (*Id*.)  She then usually lays down with a heating pad for pain relief.  (*Id*.)  Claimant's grandmother helps do the laundry because she has trouble going up and down the stairs.  (R. 46-47.)  Her grandparents or her sister also do the grocery shopping.  (R. 44.)  Claimant can bathe herself, but her children sometimes help her get her shoes on.  (R. 46.)  Claimant previously had a driver's license, but no longer drives because she does not have a car.  (R. 34.)  Her family members drive her and her children around or she sometimes takes the bus, which can be difficult if it involves too much walking.  (R. 34.)  Claimant does not go to the movies, attend church, or socialize outside her family.  (R. 46-47.)  Her only hobby is crossword puzzles, which she works on in a sitting position by propping herself up with pillows and a pad behind her back.  (R. 47-48.)

Claimant explained that she recently tried to work through a temp agency preparing food in 2017, but her work on the job lasted only about ten minutes because she could not stand while making the sandwiches.  (R. 35.)  Her most recent full-time job was at a child-care facility in 2010-2011, mostly caring for infants.  (R. 36.)  She said she left that job because of her back pain.  (*Id*.)

Nonetheless, Claimant further testified that she was trying to find sit-down jobs, like customer service for example, and that she could usually sit for "[m]aybe like an hour" at a time.  (R. 37, 41.)  After the ALJ asked Claimant whether she thought she would be able to perform a

job that was mainly sitting, Claimant responded by stating: "I don't know because sitting for a long period of time hurts and then sometimes I have to like put a heating pad on my back to ease the pain." (R. 37.) The ALJ followed up by asking Claimant: "[i]f you had a job that allowed you to stand for 10 minutes after you had been sitting an hour and then sit down and continue working, if you could do that throughout the work day, would that be enough to help you get through the day?" (R. 41.) Claimant did not outright reject that possibility that she would be able to perform such a job. Instead, she stated: "I don't know because most of the time like from sitting up for a little while, I have to like lay across the bed or put a heating pad on my back and lay on that." (R. 41.)

### D.    Claimant's Grandmother's Testimony

Claimant's grandmother Joyce B. also offered testimony at the hearing. According to Joyce , Claimant is often laying down in pain and only leaves the house when she has to take her kids somewhere. (R. 51-52.) Joyce visits Claimant frequently to help take care of the children, do laundry, and go to the store. (R. 51-52.) Joyce confirmed that Claimant needs help with the laundry because she has trouble lifting and going up and down the stairs. (R. 52.) Joyce stated that when Claimant goes to the grocery store she has to lean on the cart for support. (*Id*.) Joyce believed Claimant would have trouble performing even a sedentary job because of her back pain and the skin problems on her arm. (R. 53-54.)

### E.    Evidence from the Vocational Expert's Testimony

A vocational expert ("VE") also offered testimony. The VE first categorized Claimant's past work as a day care worker, which is semi-skilled and light as defined in the Dictionary of Occupational Titles ("DOT") and as performed by Claimant. (R. 57.)

Next, the ALJ asked the VE to consider a hypothetical individual of Claimant's age, education, and experience who had the capacity to perform light work, with no more than frequent balancing, occasional stooping, kneeling, crouching, crawling, or climbing of ramps and stairs, and who could never climb ladders, ropes, and scaffolds. (R. 57.) The VE explained that such an individual would be unable to perform Claimant's past work as a day care worker. (R. 57-58.) The individual could, however, perform work in the light positions of hand packer, assembler, or sorter. (R. 58.) If the individual had the same limitations, but was further limited to sedentary work, she could still work in the sedentary positions of sorter, assembler, or packer. (*Id*.) The individual could still work in those positions if she could only occasionally reach overhead and frequently reach in other directions with her right arm. (R. 58-59.) If the individual in the sedentary hypothetical required a sit/stand option every forty-five minutes, the VE testified that she could perform the same jobs, but the number of positions available would be reduced by fifty percent. (R. 59.)

Lastly, the VE explained that an individual who required a five to ten-minute break every hour would be unable to perform any jobs in the national economy. (R. 59.) According to the VE, employers tolerate 15 percent off task time per day and one and a half absent days per month. (*Id*.) An individual who missed two days a month would be unemployable. (*Id*.) The VE confirmed that her testimony was consistent with the DOT. (R. 60.)

## II. THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her application date. (R. 13.) Next, at step two, the ALJ determined that Claimant suffered from the severe impairments of lumbar degenerative disc

disease with mild stenosis, minimal right knee degenerative joint disease, and morbid obesity. (R. 13-14.) The ALJ considered Claimant's kidney stones, skin disorder, vitamin D deficiency, and complaints of pain in her right shoulder and left foot, but found these problems were either non-severe or non-medically determinable impairments. (R. 14.) At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments, including listing 1.02 (major dysfunction of a joint) and listing 1.04 (disorders of the spine). *See* 20 C.F.R. Part 404, Subpart P, App. 1.

The ALJ noted that while obesity is no longer a listed impairment, she considered Claimant's obesity in relation to the other listings as required. (R. 14.) Specifically, the ALJ found:

> The claimant is five feet and eight inches tall and has weight ranging from 355 to 379 pounds for a Body Mass Index between 54.0 to 57.6. The claimant is morbidly obese. I have considered how weight affects her ability to perform routine movement and necessary physical activity within the work environment. I am aware that obesity is a risk factor that increases an individual's chances of developing impairments in most body symptoms. Obesity can cause limitation of function and the effects of obesity may not be obvious. The combined effects of obesity with other impairments may be greater than might be expected without the disorder. I have considered any added or accumulative effects the claimant's obesity payed on her ability to function, and to perform routine movement and necessary physical activity within the work environment. In spite of her weight, clinicians observed the claimant ambulate normally without an assistive device, and to retain a functional, if not always full and pain free, range of motion. The claimant's neurological status in terms of motor power, reflex activity, and sensation were largely intact, and her musculoskeletal and extremity reviews were commonly free of deformity, clubbing, cyanosis, edema, heat, discoloration, ulceration, diminished pulsation or atrophic changes.
>
> The claimant's pain, fatigue, shortness of breath, reduced ranges of motion, and the complicating effect of her morbidly obese body habitus limit her to sedentary work. These signs, symptoms, and finding further dictate she can only frequently balance, only occasionally stoop, kneel, crouch, crawl and climb ramps and stairs, but never limb ladders, ropes and scaffolds.

(R. 17.)

The ALJ went on to assess Claimant's RFC, ultimately concluding that she had the RFC to perform sedentary work as defined in 20 C.F.R. §416.967(a)[4], except that she could only frequently balance, occasionally stoop, kneel, crouch, crawl and climb ramps and stairs, and could never climb ladders, ropes and scaffolds. (R. 14-18.) At step four, the ALJ determined that Claimant had past relevant work as a daycare worker (light as defined and performed), which she could no longer perform because she is limited to a reduced range of sedentary work. (R. 19.) Lastly, at step five, the ALJ concluded that given Claimant's age, education, and RFC, she could perform jobs that exist in significant numbers in the national economy, including the representative occupations of sorter, assembler, and packer. (R. 19-20.) As such, the ALJ found that Claimant was not under a disability from the application date through the date of the decision. (R. 20.)

## III.    STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul,* 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and free

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §416.967(a).

from legal error. *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, by making independent symptom evaluations, or by otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

IV.    **ANALYSIS**

**A.  The ALJ's RFC Assessment Is Supported By Substantial Evidence.**

Claimant's arguments boil down to whether the ALJ properly concluded that Claimant had the RFC to perform sedentary work, with some additional postural limitations. Again, "[t]he RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014). The task of assessing a claimant's RFC is reserved to the Commissioner. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

"In determining what a claimant can do despite [her] limitations, the [ALJ] must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's

own statement of what he or she is able or unable to do." *Id.*; *Murphy,* 759 F.3d at 818. Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; medical source statements; effects of the claimant's symptoms; the reports of activities of daily living ("ADL"); lay evidence; and evidence from attempts to work. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (July 2, 1996). In formulating the RFC, "[t]he ALJ has the responsibility of resolving any conflicts between the medical evidence and the claimant's testimony." *Pepper v. Colvin,* 712 F.3d 351, 807 (7th Cir. 2014).

For the reasons that follow, the Court finds that the ALJ's RFC assessment was is supported by substantial evidence.

### 1. The ALJ Properly Considered Claimant's Obesity.

Claimant first argues that the ALJ failed to properly consider her well-documented obesity and its effect on her RFC. (Dckt. #10 at 3.) Although, as Claimant correctly acknowledges, "obesity is no longer a standalone disabling impairment, the ALJ must still consider its impact when evaluating the severity of other impairments." *Stephens v. Berryhill*, 888 F.3d 323, 328 (7th Cir. 2018) (citation omitted). This is because the "combined effects of obesity with other impairments may be greater than might be expected without obesity." [5] Social Security Ruling ("SSR") 02-1P, 2002 WL 34686281, at *6 (Sept. 12, 2002); *see also Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40.").

---

[5] Before May 20, 2019, SSR 02-1p addressed obesity. On May 20, 2019, the SSA rescinded SSR 02-1p and replaced it with SSR 19-2p. *See* SSR 19-2p, 2019 WL 2374244, at *1 (May 20, 2019). SSR 02-1p, however, was the applicable rule at the time the ALJ issued her decision in April 2018. *See Mitchel A. v. Saul,* No. 19 CV 1757, 2020 WL 2324425, at *10 n.6 (N.D.Ill. May 11, 2020).

16

Here, the ALJ properly considered Claimant's obesity and its combined effect throughout her decision. *See Thomas v. Colvin,* 745 F.3d 802, 807 (7th Cir. 2014) ("When determining an individual's RFC, the ALJ must consider all limitations that arise from medically determinable impairments"). The ALJ first found Claimant's morbid obesity to constitute a severe impairment at step one because it – along with her other severe impairments – "significantly limit[s] her ability to perform work activities." (R. 13.) At step three, the ALJ emphasized that she considered obesity "in relation to the musculoskeletal, respiratory, and cardiovascular body system listings" she reviewed.[6] (R. 14.) The ALJ also considered Claimant's obesity in connection with her RFC assessment at step four. She reviewed her height and weight and noted that her BMI ranged from 54.0 to 57.6, making her morbidly obese. (R. 17.) The ALJ further noted, however, that "in spite of her weight, clinicians observed the claimant ambulate normally without an assistive device, and to retain a functional, if not always full and pain free, range of motion." (R. 17.) Nonetheless, in part due to the "complicating effect of [claimant's] morbidly obese body habitus," the ALJ limited Claimant to sedentary work with additional postural limitations, which – as discussed below – is a decision supported by substantial evidence.

Given that the ALJ expressly considered Claimant's obesity in connection with her other impairments and complaints, Claimant's argument that the ALJ failed to properly account for her obesity lacks merit. Notably, other than general speculations that morbid obesity can, of course, interact with other impairments to limit physical functions, Claimant has failed to cite to any record evidence showing how her obesity specifically limits her ability to perform work related activities to a greater degree than the ALJ recognized. *See, e.g., Shumaker v. Colvin,* 632 Fed.Appx. 861, 867-68 (7th Cir. 2015) ("Moreover, [claimant] does not identify any evidence in

---

[6] Claimant has not argued that the ALJ otherwise erred in the step three listing analysis.

the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments."); *see also Hernandez v. Astrue*, 277 Fed.Appx. 617, 623-24 (7th Cir. 2008) (finding harmless error in ALJ's failure to consider effects of obesity where the claimant "did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning – as it was her burden to do."). [7]  Accordingly, the Court finds no error in the ALJ's consideration of Claimant's obesity here.  *See* Stephens, 888 F.3d at 328.[8]

### 2.  The ALJ Properly Considered The Objective Medical Evidence And The Medical Source Statements In Assessing Claimant's RFC.

The remainder of Claimant's arguments surround the ALJ's decision that Claimant can perform sedentary work despite her complaints of pain and alleged limitations in standing and sitting.  The Court finds no error in this regard.

First, as she must, the ALJ considered Claimant's medical records and noted the relatively minimal findings on examination and diagnostic imaging.  *See* SSR 96-8p, 1996 WL 374184, at *5 (noting that the "RFC assessment must be based on *all* of the relevant evidence in

---

[7] Claimant also argues that the ALJ "failed to explain why [Claimant's] morbid obesity warranted limiting her more greatly than the State agency doctors did in terms of standing and walking," but not in terms of her ability to sit.  (Dckt. #10 at 7.)  As did the Court in *Monique B. v. Saul*, No. 19 CV 652, 2020 WL 4208112, at *10 n.3 (N.D.Ill. July 22, 2020), the Court rejects this argument because "there is no doctor of record stating that [claimant] had limitations in sitting."  Indeed, as discussed in more detail below, other than her own subjective complaints, the record does not include any additional limitations in Claimant's ability to sit.

[8] The Court further finds that the three cases Claimant relies on to support her assertion that the ALJ erred with respect to consideration of her obesity are distinguishable.  (Dckt. #10 at 6-7 (citing cases).)  In the first case, *Gentle v. Barnhart*, 430 F.3d 865 (7th Cir. 2005), the ALJ failed to even consider the incremental effect that claimant's obesity had on her disability.  *Id.* at 868.  In the second case, *Barrett v. Barnhart*, 355 F.3d 1065 (7th Cir. 2004), "the ALJ erroneously treated the claimant's obesity as merely an aggravating factor and suggested that the obesity is a self-inflicted disability that does not entitle one to benefits."  *William B. v. Saul*, No. 18 CV 50083, 2019 WL 4511544, at *9 (N.D.Ill. Sept. 19, 2019) (citing to *Barrett*).  Finally, in the third case, *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014), the ALJ failed "to consider the bearing of obesity, even when not itself disabling, on [the] claimant's ability to work."  *Id.* at 706.

the case, including medical history [and] medical signs and laboratory findings.")  For example, the ALJ cited to the x-ray imaging in the record showing normal to minimal findings of her foot, knee, and spine.  The ALJ also noted that Claimant's physicians regularly commented on her ability to ambulate regularly without assistive devices, only minimal deficits – if any – in her range of motion, and, most often, a lack of tenderness, edema, or spasms.  The ALJ also refrained from impermissible "cherry picking" by properly considering the few positive objective findings in the record, such as the positive straight leg test, reduced strength, and slouched posture at the initial physical therapy evaluation.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Second, the ALJ also properly considered all the opinions of the medical sources in the record, which in this case only included the opinions of agency reviewing physicians Drs. Gonzales and Chang and consultative examining physician Dr. Pimentel.[9]  *See Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) ("An ALJ must consider all medical opinions in the record."); 20 C.F.R. §416.927; *see also SSR 96-8p*, 1996 WL 374184, at *7 ("The RFC assessment must always consider and address medical source opinions…").  Again, Dr. Gonzales concluded that Claimant could perform medium work, with some postural limitations and, on reconsideration, Dr. Chang determined that Claimant could stand and sit (with normal breaks) "[f]or about six hours" and that she could perform light work with some postural limitations.  Dr. Pimentel found that Claimant could sit and stand, walk greater than 50 feet unassisted, and was only mildly

---

[9] The record does not include a treating source opinion of Claimant's functional capacity.

limited in her ability to lift, carry, and handle objects and carry out work-related activities due to back pain. No treating physician or other medical source recommended any additional limitations in standing, walking, or sitting.

The ALJ gave the opinions of Drs. Gonzales and Chang "mixed weight," finding the initial limitation to medium work "inappropriate" given Claimant's morbid obesity, degenerative joint and disc disease, and her complaints of pain. (R. 18.) However, the ALJ found that Dr. Chang's findings on reconsideration were well supported by the objective evidence "including exams and imaging" and Dr. Pimentel's opinion, which the ALJ also gave "considerable weight."[10] (*Id.*) The ALJ was free to consider these opinions and provided reasons for the weight he afforded each opinion based on substantial evidence in the record, including the objective medical evidence. *See Flener ex rel. Flener v. Barnhart,* 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation."); *Green v. Saul,* 781 Fed.Appx. 522, 527, 529 (7th Cir. 2019) (holding that an ALJ may discount a doctor's opinion for reasons that are supported by the record and finding no error where the ALJ explained why he assigned different weight to the different medical opinions).

More importantly, as the Commissioner argues, Claimant has not pointed to any "medical opinion that imposed RFC restrictions greater than those imposed by the ALJ" relating to her limitations in standing or sitting. *Johnson v. Berryhill*, No. 18 C 1395, 2018 WL 5787121, at *8 (N.D.Ill. Nov. 5, 2018). As this Court recently explained, "[t]his is significant because courts within this Circuit have repeatedly held that [t]here is no error in the formulation of an RFC

---

[10] The ALJ noted that he did decrease the weight of Dr. Pimentel's opinion slightly because it was not couched in a "function by function fashion." (R. 18.)

when there is no doctor's opinion contained in the record [that] indicates greater limitations than those found by the ALJ." *Hosea M. v. Saul*, No. 18 CV 2926, 2019 WL 5682835, at *7 (N.D.Ill. Nov. 1, 2019), *aff'd sub nom. Matthews v. Saul*, 833 Fed.Appx. 432 (7th Cir. 2020), *quoting Best v. Berryhill,* 730 Fed.Appx. 380, 382 (7th Cir. 2018); *see also Davis v. Berryhill,* 723 Fed.Appx. 351, 356 (7th Cir. 2018) (same); *Patricia B. v. Berryhill,* No. 17 CV 50201, 2019 WL 354888, at *4 (N.D.Ill. Jan. 29, 2019) (same); *Jodi L. v. Berryhill,* No. 17 CV 50235, 2019 WL 354962, at *4 (N.D.Ill. Jan. 29, 2019) (same). Here, Claimant did not provide a treating source opinion regarding her functional capabilities and no medical source contemplated further restrictions than the ALJ. Thus, the ALJ's assessment of the medical opinions in determining her RFC is supported by substantial evidence.[11]

## B. The ALJ Properly Considered Claimant's Subjective Symptoms.

Lastly, and contrary to Claimant's assertion, the ALJ properly considered Claimant's subjective symptoms, including her allegations of pain and limitations in standing and sitting. Indeed, the ALJ must sufficiently explain her evaluation of a claimant's subjective symptoms "by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367. The ALJ's discussion must allow a reviewing Court "to determine whether [the ALJ] reached her decision in a rational manner, logically based on her specific findings and the evidence in the record."

---

[11] Claimant's assertion that the ALJ erred because her RFC did not mirror one of the opinions in the record falls short. In determining a claimant's RFC, "the ALJ is not required to rely entirely on a particular physician's opinion." *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007); *see also Lance Maurice A. v. Comm'r of Soc. Sec.*, No. 20 CV 226, 2020 WL 6270894, at *6 (S.D.Ill. Oct. 26, 2020) ("Further, Plaintiff's arguments about the opinion evidence assumes that the ALJ had to choose a medical opinion as the basis for his RFC determination. That is incorrect."). Here, the ALJ properly assessed the medical opinions and gave them some weight but – based in part on some of Claimant's complaints – further limited her to sedentary work. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("[The RFC] finding was more limiting than that of any state agency doctor or psychologist, illustrating reasoned consideration given to the evidence [claimant] presented.").

*McKinzey*, 641 F.3d at 890. The Court will only overturn the ALJ's subjective symptom assessment if it is "patently wrong," that is, lacking "any explanation or support." *Elder*, 529 F.3d at 413.

Social Security Ruling ("SSR") 16-3p provides additional guidance to the ALJ for assessing the Claimant's symptoms.[12] SSR 16-3p calls for a two-step process whereby the ALJ first determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce her symptoms. SSR 16-3p, 2017 WL 4790249, *49463. Next, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." *Id.* at *49464; *Apke v. Saul,* 817 Fed.Appx. 252, 257 (7th Cir. 2020). In making this evaluation, the ALJ should consider the entire case record, along with (1) the claimant's daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitation and aggravating factors; (4) type, dosage and side effects of medication; (5) treatment other than medication; and (6) any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2017 WL 4790249, *49465-66; 20 C.F.R. §416.929.

---

[12] Because the ALJ issued her ruling after March 28, 2016, SSR 16-3p, which superseded SSR 96-7p, applies here. *See* SSR 16-3p, 2017 WL 4790249, n.27. SSR 16-3p shifted the focus from a claimant's credibility to clarify that "subjective symptom evaluation is not an examination of the individual's character" but instead entails a careful application of "regulatory language regarding symptom evaluation." *Id.* at 49463; *see also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (noting that ALJs are not "in the business of impeaching claimants' character"). Nonetheless, SSR 96-7p and SSR 16-3p "are not patently inconsistent with one another," and a "comparison of the two Rulings shows substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms." *Shered v. Berryhill*, No. 16 CV 50382, 2018 WL 1993393, at *5 (N.D.Ill. Apr. 27, 2018).

The ALJ followed this two-step analysis here, first determining that Claimant's obesity and degenerative joint disorders could reasonably be expected to cause her symptoms. But, at the second step, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 15.) Those reasons are sound and allow this Court to conclude that the ALJ reached her decision in a rational manner supported by substantial evidence in the record. *McKinzey*, 641 F.3d at 890.

At the outset, the Court notes that Claimant takes issue with the ALJ's use of "not entirely consistent," arguing that is improper boiler plate and does not provide the proper legal standard. (Dckt. #10 at 11-12 (citing *Minger v. Berryhill*, 307 F.Supp.3d, 872-873 (N.D.Ill. 2018)). But as the Seventh Circuit very recently reiterated, the "phrase 'not entirely credible' (or 'not entirely consistent') is meaningless only when the ALJ gives no legitimate reasons for discrediting the claimant's testimony." *Lacher v. Saul*, 830 Fed.Appx. 476, 478 (7th Cir. 2020); *see also Harris v. Saul*, 830 Fed.Appx. 881, 886 (7th Cir. 2020) ("[E]ven though the 'entirely consistent' language is boilerplate, the ALJ's recitation of it is harmless because he described (and applied) the correct standard of whether Harris's statements about her symptoms were substantiated by the objective medical evidence and other evidence in the record."). Because – as we turn to next – the ALJ provided legitimate reasons here, the use of the boilerplate language is harmless.

First, as discussed above, the ALJ fairly noted that the "minimal or mild" objective findings upon examination, the diagnostic imaging, and the medical source opinions conflicted with Claimant's allegations of extreme limitations in standing, sitting, and the need to lay down most of the day. *See Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (The ALJ permissibly

discounted [claimant's] testimony of incapacitating pain because it conflicted with the objective medical evidence and most of the record.")  While it is true that the ALJ may not discount a claimant's subjective symptoms solely because they are not substantiated by medical evidence, *see* SSR 16-3p, 2017 WL 4790249, at *49465,[13] the ALJ acted properly by considering Claimant's testimony regarding her limitations in sitting and standing when formulating her RFC in a more limited fashion than indicated by the medical opinions even if the ALJ did not credit that portion of Claimant's testimony regarding her alleged need to lay down for most of the day due to her back pain.  (R. 16.); *See, e.g., Green,* 781 Fed.Appx. at 526-27 (holding that "ALJs are tasked with reviewing the evidence provided and assessing whether a claimant is exaggerating the effects of her impairments" and finding no error where the ALJ "used what he heard from [claimant] . . . to tailor an RFC that fit her limitations, though not necessarily the intensity to which she testified"); *Barrett v. Saul,* 822 Fed.Appx. 493, 497 (7th Cir. 2020) (holding that "the ALJ's partially adverse credibility finding" regarding claimant's testimony was not patently wrong).

The Court takes note that when the ALJ asked Claimant point blank whether she believed she could perform a job that would involve her sitting for an hour and then standing for 10 minutes throughout the course of the day, Claimant testified that "I don't know."  (R. 41.) Rather than presuming that Claimant could not perform such work, the ALJ reviewed the medical opinions (which found that Claimant could sit and stand for about 6 hours during the workday) and other relevant evidence and formulated an RFC indicating that Claimant was capable of performing such sedentary work.  This was not "patently wrong."  *Green,* 781 Fed.Appx. at 527, *quoting Alvarado v. Colvin,* 836 F.3d 744, 749 (7th Cir. 2016); *Zoch,* 981 F.3d

---

[13] By the same token, it is equally clear that "[a] claimant's assertions of pain, taken alone, are not conclusive of a disability."  *Zoch v. Saul,* 981 F.3d at 601.

at 601-02 (holding that ALJ did not err when rejecting claimant's testimony that she could not sit more than 15 minutes where her testimony was contradicted by the objective medical evidence and neither the agency consultant nor the treating physician opined that claimant could not handle sedentary work).

The ALJ also considered other factors enumerated in SSR 16-3p. For example, the ALJ took account of Claimant's "limited, routine, and conservative pattern" of treatment, which consisted of only pain medication and a very short stint in physical therapy, and did not include injections, an ablation or rhizotomy. (R. 15-16.) "[T]he Seventh Circuit has held that it is reasonable for an ALJ to consider a claimant's conservative treatment." *Anthony G. v. Saul*, 2020 WL 439964, at *10 (N.D.Ill. Jan. 28, 2020) (citing *Simila v. Astrue,* 573 F.3d 503, 519 (7th Cir. 2009) (upholding finding based in part on "relatively conservative" treatment)).

As she must, the ALJ also acknowledged the reason why Claimant's course of physical therapy was cut short, *i.e.*, transportation problems.[14] *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) ("[W]hile infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding, we have emphasized that the ALJ must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care.") (internal quotations and citations omitted). But of obvious significance to the ALJ here was not the short course of therapy, but rather the lack of more intensive treatment – or even any recommendations thereof by her treating physicians – in the face of her allegedly debilitating pain. The Court finds no error in this regard. *See Chestine G. v. Saul*, No. 18 C 4980, 2020 WL 1157384, at *4 (N.D.Ill. Mar. 10, 2020*)* ("The ALJ

---

[14] Claimant briefly argues that her application for SSI alone suggests a dire financial situation, such that even if she required more intensive treatment," she would be "unable to obtain it." (Dckt. #10 at 13.) But Claimant did not provide this reasoning to the ALJ, and as the Commissioner emphasizes, there is no objective evidence that any doctor ever suggested more intensive treatment.

reasonably relied on [claimant's] conservative treatment and did not err by viewing [claimant's] conservative treatment as inconsistent with pain so severe that it rendered her unable to work.").

The ALJ also considered Claimant's daily activities, *see* 20 C.F.R. §416.929, and the testimony of her grandmother (Joyce B.) regarding those activities. The ALJ gave Joyce's testimony "limited weight" because she is not a medical source, has a personal relationship with Claimant, and – most significantly – because her testimony conflicted with the "objective evidence from physical exams or imaging." (R. 18.) While Claimant is correct that an ALJ may not discount a family member's testimony for the first two reasons stated above alone, *see e.g. Roque v. Colvin*, No 15 CV 392, 2016 WL 1161292, at *5 (N.D.Ill. Mar. 22, 2016), it was within her purview to discount the testimony for the inconsistency with the medical record. *See Brookins v. Saul*, No. 17 CV 06708, 2020 WL 4365909, at *9 (N.D.Ill. July 30, 2020) ("But the ALJ did not rely exclusively on [claimant's] mothers' bias or lack of expertise, and where the "most important" factor in assigning weight—inconsistency with the medical record— was a sound one, the decision is supported by substantial evidence.").

Lastly, although the ALJ briefly mentioned Claimant's failed attempt to return to work, she did not, as Claimant suggests, "intimate[] that a claimant who attempts to work is capable of working." (Dckt. #10 at 14.) As the Commissioner argues, the ALJ's "brief mention of Claimant's attempt to work was but one factor, among many, in her assessment of [Claimant's] subjective symptom allegations." (Dckt. #18 at 9.) Even if the ALJ erred by mentioning Claimant's attempt to return to work – and this Court does not find that she did – such an isolated error in the midst of the ALJ's other findings would not require the Court to overturn the ALJ's symptoms analysis. *See, e.g., Vanover v. Colvin,* 627 Fed.Appx. 562, 566-67 (7th Cir. 2015).

In sum, for all of these reasons, the ALJ's subjective symptom analysis, while perhaps not perfect, was not "patently wrong." *See Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D.Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin,* 519 Fed.Appx. 951, 961 (7th Cir. 2013) ("The ALJ's credibility assessment need not be perfect; it just can't be patently wrong.")). "Ultimately, it is for the ALJ to weigh the evidence and to make judgments about which evidence is most persuasive." *Bruce P. v. Saul*, No. 18 CV 7478, 2020 WL 7042888, at *14 (N.D.Ill. Dec. 1, 2020) (citing *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989)). The ALJ has provided sufficient reasoning for her judgments here grounded in substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment (Dckt. #10) is denied and the Commissioner's motion for summary judgment (Dckt. #17) is granted. The decision of the ALJ is affirmed. It is so ordered.


**ENTERED:   April 22, 2021**

**Jeffrey I. Cummings**
**United States Magistrate Judge**